**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 20-cv-03780-NYW

LIJUAN WANG,

      Plaintiff,

v.

ALLIANCE FOR SUSTAINABLE ENERGY, LLC,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Alliance for Sustainable Energy, LLC's ("Alliance" or "Defendant") Motion for Summary Judgment (or "Motion"). [Doc. 30, filed January 28, 2022]. After carefully considering the Parties' briefing and the applicable case law, this Court finds that oral argument will not materially assist in the disposition of the instant Motion and respectfully **GRANTS** the Motion for Summary Judgment.[1]

## BACKGROUND

This action, initiated on December 23, 2020, arises from the employment of Plaintiff Lijuan Wang, PhD ("Dr. Wang" or "Plaintiff") with Alliance. *See* [Doc. 1]. Dr. Wang alleges Alliance discriminated against her based on her race, ancestry, ethnicity, color, national origin, and sex, and retaliated against her for engaging in protected activity. *See* [Doc. 6 at 1]. In the operative First

---

[1] This civil action was originally assigned to the undersigned in her capacity as Magistrate Judge for a decision on the merits pursuant to the Parties' consent. *See* [Doc. 13; Doc. 15]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. On July 22, 2022, Judge Nina Y. Wang was appointed as a United States District Judge and retained assignment to this action as the presiding judge. *See* [Doc. 61]. Judge Wang and Dr. Wang are unrelated.

Amended Complaint and Request for Jury Trial ("First Amended Complaint"), Dr. Wang asserts six claims against Alliance:

1. Discrimination based on race, ancestry, ethnicity, color, and national origin in violation of 42 U.S.C. § 1981 (Count I);

2. Retaliation in violation of 42 U.S.C. § 1981 (Count II);

3. Discrimination based on race, ancestry, ethnicity, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count III);

4. Sex discrimination in violation of Title VII (Count IV);

5. Retaliation in violation of Title VII (Count V); and

6. Sex-based pay discrimination in violation of Title VII (Count VI).

*See* [*id.* at ¶¶ 118–84].

Plaintiff filed the operative First Amended Complaint on January 27, 2021. [*Id.*]. Defendant initially answered on April 12, 2021, [Doc. 16], and then filed an Amended Answer on November 10, 2021.  [Doc. 24].  On January 28, 2022, Defendant filed the instant Motion for Summary Judgment.  [Doc. 30].  Following an extension of time, *see* [Doc. 33; Doc. 36], Plaintiff responded to the Motion on April 11, 2022, *see* [Doc. 44], and Defendant replied on April 25, 2022, *see* [Doc. 45].[2]  The Motion for Summary Judgment is thus ripe for disposition.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[2] The Court held a Final Pretrial Conference on June 30, 2022, *see* [Doc. 56], and a four-day jury trial is currently scheduled to commence on February 21, 2023.  *See* [Doc. 58 at 1].

56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy her burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## UNDISPUTED MATERIAL FACTS

The Court draws the following undisputed material facts from the record before it.

**Dr. Wang's Employment with Alliance**

1.      Alliance hired Dr. Wang for the position of Researcher III-Mechanical Engineering on July 5, 2011. [Doc. 30-1 at 29:9–14; Doc. 30 at ¶ 1; Doc. 44 at ¶ 1].[3] The job titles "Researcher" and "Engineer" are used synonymously at Alliance. [Doc. 30-1 at 30:5–18; Doc. 30 at ¶ 2; Doc. 44 at ¶ 2].

2.      Throughout her employment with Alliance, Dr. Wang worked in Golden, Colorado at the National Renewable Energy Laboratory ("NREL"), a facility managed and operated by Alliance. [Doc. 30-1 at 41:10–20; Doc. 30 at ¶ 4; Doc. 44 at ¶ 4].

3.      Dr. Wang worked in the Mobility, Behavior and Advanced Powertrains Group in the Mechanical & Thermal Engineering Sciences ("MTES") directorate, within the Center for Integrated Mobility Sciences ("CIMS"). [Doc. 30-1 at 33:12–34:4; Doc. 30 at ¶ 5; Doc. 44 at ¶ 5].

4.      A Researcher III's job responsibilities at Alliance included, among others, (i) developing independent research; (ii) displaying substantial and significant record of achievement through reports, publications, intellectual property, and technical products; (iii) working under nominal supervision; and (iv) the ability to develop into a role model for effective and creative technical leadership, to build effective teams, and to enhance the technical and professional skills of junior staff. [Doc. 30-2].

5.      In addition, Alliance expected Dr. Wang, as a Researcher III, to develop research funding over time. [Doc. 30-3 at 28:5–30:1]. Dr. Wang was also expected to demonstrate clear

---

[3] The Court will cite to paragraph numbers when referring to the Defendant's Statement of Undisputed Material Facts, *see* [Doc. 30 at 2–9], and Plaintiff's Responses to same, *see* [Doc. 44 at 2–10].

and effective communication skills, [Doc. 30 at ¶ 6], which included, for instance, "clearly explaining and presenting her work, practicing active listening (including conveying when she has or has not understood someone else, such as by repeating back a summary of the main points that she has understood), and further improving her writing skills," [Doc. 44-1 at 56].[4]

6.      At all times relevant to the events in this action, Dr. Wang reported directly to Group Manager Jeffrey Gonder ("Mr. Gonder").  Mr. Gonder, in turn, reported to Chris Gearhart ("Dr. Gearhart"), Center Director of the CIMS; and Dr. Gearhart reported to Johney Green ("Dr. Green"), Associate Lab Director ("ALD").  [Doc. 30-1 at 39:23–41:2; Doc. 30-3 at 9:24–10:2; Doc. 30 at 3; Doc. 44 at 3].

---

[4] Dr. Wang claims "[t]here are genuine issues of material fact as to what [her] duties were as a Researcher III."  [Doc. 44 at ¶ 6].  For support, she argues that her "duties and responsibilities as a Researcher III are unclear" on the basis that, although her job description "includes the essential responsibilities that she must adhere to," her manager, Jeffrey Gonder, referenced various issues in Dr. Wang's FY2017, FY2018, and FY2019 performance reviews which were "not included in her job description." [Id. at 10].  Those issues, according to Dr. Wang, included specific references to her "communication skills being lacking and that she [was] not producing the amount of work expected of a Researcher III." [Id.].  The Court does not find that Dr. Wang's assertions create a genuine factual dispute regarding her job responsibilities and Alliance's expectations of her as a Researcher III.  Notably, her job description contained an express disclaimer: "The above statements are intended to describe the general nature and level of work being performed by people assigned to this classification. *They are not intended to be construed as an exhaustive list of all responsibilities, duties, and skills required of personnel so classified.*" [Doc. 30-2 at 3 (emphasis added)].  Dr. Wang also presents no evidence to dispute CIMS Director Chris Gearhart's testimony that Alliance expected Researcher IIIs to develop research funding over time. *See* [Doc. 30-3 at 29:18–30:1].  And, in her First Charge, she claimed that "[a]pplying for funding is an important part of my job." [Doc. 30-19 at 5].  In addition, Dr. Wang's own exhibits reflect that Alliance's expectations of her included demonstrating clear, effective communication orally and in writing, including that she was aware of such expectations several years before her FY2017 Review. *See, e.g.*, [Doc. 44-1 at 56 (In her FY2015 Review, noting that "[l]ast year I also asked Joann to improve communication of her regular work progress . . .."); Doc. 30-9 at 2–3 ("Communication improvements – difficulty with descriptive communication and clear language in writing and discussions leads to misinterpretations and impressions of 'talking past each other' with some regularity.")].

**Alliance's Performance Review Process**

7.     Alliance formally reviews the performance of its employees based on their performance for the fiscal year ("FY"), which runs from October 1 to September 30.  [Doc. 30-4 at 40:13–20; Doc. 30 at ¶ 8; Doc. 44 at ¶ 8].

8.     Alliance's performance review process includes, *inter alia*, (a) employees completing a self-assessment, after which group managers review their direct reports' self-assessments; (b) calibration meetings with Dr. Gearhart and management to jointly discuss reviews of employees in the CIMS and ensure consistency among ratings; and (c) specifically discussing at the calibration meetings the employees with "Needs Improvement" ratings or who are on the borderline of such rating.  [Doc. 30-3 at 22:6–24:10; Doc. 30-4 at 26:11–27:10, 31:18–33:10; Doc. 30 at ¶¶ 13–14; Doc. 44 at ¶¶ 13–14].

**Dr. Wang's Performance Reviews**

9.     Dr. Wang's performance was repeatedly discussed at the annual calibration meetings.  [Doc. 30-3 at 24:1–10; Doc. 30-5 at 26:2–27:1; Doc. 30 at ¶ 16; Doc. 44 at 16].[5]

10.    Dr. Wang first received a "Needs Improvement" rating on her FY2014 performance review.  [Doc. 30-1 at 144:17–145:16; Doc. 30 at ¶ 17; Doc. 44 at ¶ 17].

11.    On December 21, 2017, Dr. Wang received a "Needs Improvement" rating on her FY2017 performance review.  [Doc. 30-6 at 5; Doc. 30 at ¶ 18; Doc. 44 at ¶ 18].

12.    On August 3, 2018, Dr. Wang received additional performance feedback in the

---

[5] In her Response, Plaintiff states that "[t]here are genuine issues of material fact as to whether Dr. Wang's performance was repeatedly discussed at the annual calibration meetings because her performance was low."  [Doc. 44 at ¶ 16].  For support, however, Plaintiff acknowledges that her "level of performance may have been discussed at calibration meetings," and clarifies that her dispute is regarding Defendant's assertion "that she was consistently discussed because she was one of the lower performers."  [*Id.* at 11].

form of a Mid-Year review, [Doc. 30-7; Doc. 30 at ¶ 19; Doc. 44 at ¶ 19], the stated purpose of which was to "check[] in on her progress against the performance improvement items" that she and Mr. Gonder had previously discussed in relation to the "Needs Improvement" rating she received on her FY2017 performance review. [Doc. 30-7 at 2].

13.    On December 17, 2018, Dr. Wang received a "Needs Improvement" rating on her FY2018 performance review. [Doc. 30-8 at 6; Doc. 30 at ¶ 20; Doc. 44 at ¶ 20].

14.    Around the same time, Alliance placed Dr. Wang on a 60-day Performance Improvement Plan ("PIP"), which became effective on December 31, 2018. [Doc. 30-9; Doc. 30 at ¶ 20; Doc. 44 at ¶ 20].

15.    After the PIP went into effect, Mr. Gonder and Gyda Torbet ("Ms. Torbet"), an Alliance Human Resources ("HR") Business Partner, held bi-monthly meetings with Dr. Wang to discuss her progress and provide her with suggestions for improving her performance. [Doc. 30-1 at 160:11–163:23; Doc. 30-4 at 52:10–53:15; Doc. 30-10 at 93:7–95:20; Doc. 30 at ¶ 21; Doc. 44 at ¶ 21].

16.    Dr. Wang's PIP was extended past 60 days due to an approved leave of absence requested and taken by Dr. Wang. [Doc. 30-1 at 167:24–168:21; Doc. 30 at ¶ 22; Doc. 44 at ¶ 22].

17.    In April 2019, at the end of the PIP period, Dr. Wang delivered a presentation to Mr. Gonder, Ms. Torbet, and others, including individuals whom Dr. Wang asked to be present ("PIP Presentation"). [Doc. 30-1 at 163:24–167:8; Doc. 30-10 at 95:21–97:21; Doc. 30 at ¶ 23; Doc. 44 at ¶ 23].

18.    Mr. Gonder provided formal feedback to Dr. Wang in December 2019 about the PIP Presentation and her FY2019 performance, noting that she continued to display gaps in rigor, communication, and understanding tasks while requiring extensive supervision. [Doc. 30-11; Doc.

30-12; Doc. 30-10 at 41:6–42:16; Doc. 30 at ¶ 24; Doc. 44 at ¶ 24].

19.     On December 20, 2019, Dr. Wang received her third consecutive "Needs

Improvement" rating on her FY2019 performance review. [Doc. 30-1 at 170:23–171:18; Doc. 30-

12 at 5; Doc. 30 at ¶ 25; Doc. 44 at ¶ 25].

20.     On or about January 22, 2020, Alliance informed Dr. Wang that she would be

demoted from a Researcher III to Researcher II position. [Doc. 30-4 at 60:1–71:15; Doc. 30-10 at

66:21–67:3; Doc. 30 at ¶ 26; Doc. 44 at ¶ 26].

21.     Dr. Wang's salary and benefits were not reduced when she was demoted to

Researcher II. [Doc. 30-1 at 173:24–174:6; Doc. 30 at ¶ 27; Doc. 44 at ¶ 27].

22.     After Dr. Wang's demotion to a Researcher II, she continued to have performance

issues, which included unsuccessful efforts to secure funding for her research. [Doc. 30-10 at

110:1–111:8; Doc. 44-1 at 147–54].[6]

23.     During the final year of her employment, there were times when Dr. Wang charged

half of her time to CIMS overhead, which is not sustainable because there is a finite amount of

internal overhead funding as researchers are expected to be supported by direct funding projects.

---

[6] In her Response, Dr. Wang disputes that she continued to have performance issues following her
demotion on the basis that "when she was terminated . . . she had an internal project to cover her
time and was not using a significant amount of overhead funds." [Doc. 44 at 11]. This assertion
does not create a factual dispute given that (1) Dr. Wang does not dispute Defendant's assertion
that she had "performance issues" generally; (2) whether Dr. Wang had funding "when she was
terminated" does not address the entirety of the time she spent as a Researcher II; and (3) for
support, Dr. Wang relies on her deposition testimony, *see* [Doc. 44 at 11–12], and that testimony
includes that the "first few months" *after* her demotion to Research II, she "still charge[d] some of
the overhead," [Doc. 30-1 at 174:24–175:12]. Accordingly, the Court deems this fact undisputed.
Fed. R. Civ. P. 56(e).

[Doc. 30-10 at 110:1–111:8].[7]

24.     On or about July 8, 2020, Alliance notified Dr. Wang that her employment was being terminated.  [Doc. 30-1 at 141:5–24; Doc. 30 at ¶ 31; Doc. 44 at ¶ 31].  The termination notice stated that Dr. Wang was being terminated due to "continued concerns and insufficient demonstration of improvement" during the eighteen months when Mr. Gonder "ha[d] formally worked with [Dr. Wang] regarding continued performance issues."  [Doc. 30-14 at 2].

25.     Dr. Wang stated that no one at Alliance ever used the words "English language" when discussing Dr. Wang's communication skills.  [Doc. 30-1 at 96:17–20; Doc. 30 at ¶ 45; Doc. 44 at ¶ 45].

**Dr. Wang's Complaints of Discrimination**

26.     On January 4, 2019—four days after the PIP went into effect—Dr. Wang filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race and national origin, as well as retaliation ("First Charge"). [Doc. 30-5; Doc. 30 at ¶ 32; Doc. 44 at ¶ 32].  Dr. Wang amended the First Charge three times in 2019: on January 25, March 28, and April 12.  [Doc. 30-17; Doc. 30-18; Doc. 30-19; Doc. 30 at ¶ 34; Doc. 44 at ¶ 44].  The EEOC dismissed the First Charge and issued a Right to Sue letter on September 27, 2019.  [Doc. 30-20; Doc. 30 at ¶ 35; Doc. 44 at ¶ 35].

27.     On January 23, 2020—the day after she learned about her demotion from Researcher III to Researcher II—Dr. Wang submitted an internal complaint to Alliance regarding conduct dating back to December 2017, including allegations of bias and retaliation by Mr.

---

[7] Dr. Wang disputes that she was charging half her time, *on average*, to overhead on the basis that "evidence shows that this assertion may not be the case."  [Doc. 44 at 12].  But there is no dispute that Dr. Wang testified that for the "first few months" after her demotion to Research II, she "still charge[d] some of the overhead," [Doc. 30-1 at 174:24–175:12].

Gonder.  [Doc. 30-21; Doc. 30 at ¶ 36; Doc. 44 at ¶ 36].

28.     Alliance investigated the internal complaint.  [Doc. 30-22 at 2; Doc. 30-23 at 2].

On May 26, 2020, Alliance informed Dr. Wang that it completed the investigation.  [Doc. 30-23

at 2; Doc. 30 at ¶ 39; Doc. 44 at ¶ 39].

29.     On April 28, 2020, Dr. Wang filed a second charge of discrimination with the

EEOC, alleging discrimination based on race, sex, national origin, and retaliation ("Second

Charge").  [Doc. 30-24; Doc. 30 at ¶¶ 40–41; Doc. 44 at ¶¶ 40–41].  The Second Charge did not

allege discrimination based on color.  [Doc. 30-24; Doc. 30 at ¶ 42; Doc. 44 at ¶ 42].  The EEOC

dismissed the Second Charge and issued a Right to Sue letter on September 29, 2020.  [Doc. 30-

25; Doc. 30 at ¶ 43; Doc. 44 at ¶ 43].

**Dr. Wang's Vehicle Vandalization**

30.     During her employment with Alliance, Dr. Wang worked at Building 16, an offsite

building which is not part of the NREL Campus.  [Doc. 30-1 at 46:16–20; Doc. 30 at ¶ 46; Doc.

44 at ¶ 46].  Likewise, NREL did not own or manage the public parking lot adjacent to Building

16.  [Doc. 30-4 at 79:1–80:2; Doc. 30-1 at 47:23–48:2; Doc. 30 at ¶ 47; Doc. 44 at ¶ 47].

31.     On December 18, 2018, Dr. Wang discovered that an unknown person left a

business card on her car in the public parking lot adjacent to Building 16, stating, "learn how to

park asshole, or I will key your shit."  [Doc. 6 at ¶ 58; Doc. 30 at ¶ 48; Doc. 44 at ¶ 48].

32.     On December 26, 2018, Dr. Wang discovered there was egg on her car while it was

parked in the public parking lot adjacent to Building 16.  [Doc. 6 at ¶ 59; Doc. 30 at ¶ 49; Doc. 44

at ¶ 49].

33.     In May, July, and September 2019, Dr. Wang discovered damage to her car when

it was parking in the public parking lot adjacent to Building 16.  [Doc. 6 at ¶¶ 70, 78, 84; Doc. 30

at ¶ 50; Doc. 44 at ¶ 50].

34.     Dr. Wang does not know who left the business card with the threat on her car or who caused the damage she alleges occurred while parked at the public parking lot adjacent to Building 16.  [Doc. 30-1 at 211:18–21; Doc. 30 at ¶ 51; Doc. 44 at ¶ 51].  Dr. Wang also does not have any evidence that the person(s) responsible for the threat and damage knew she was the owner of her car, or that she is a female of Chinese descent.  [Doc. 30-1 at 213:1–8; Doc. 44 at 13].

35.     Although Dr. Wang admittedly feared for her personal safety and could have, instead, parked on the NREL campus where there are security cameras, she elected not to do so because the parking lot was a further distance from her worksite and required her to ride a shuttle to get there.  [Doc. 30 at ¶ 53; Doc. 44 at 13; Doc. 30-1 at 217:13–218:4].[8]

**Alleged Comparators**

36.     Dr. Wang identifies three male comparators she contends support her claims of sex discrimination: Eric Wood, Jacob Holden, and Stan Young.  [Doc. 30 at ¶ 55; Doc. 44 at ¶ 55].

37.     Mr. Wood holds the job title Researcher IV; has been a Principal Investigator ("PI") on projects at Alliance; and has published dozens of papers and articles, including between 2017 and 2020.  [Doc. 30 at ¶¶ 56–57; Doc. 44 at ¶¶ 56–57; Doc. 30-1 at 120:8–10, 133:3–5; Doc. 30-28].

---

[8] In her Response, Plaintiff states that "[t]here are genuine issues of material fact as to why Dr. Wang chose not to park on NREL's campus."  [Doc. 44 at ¶ 53].  However, for support, Plaintiff asserts that, despite reporting to Alliance that her vehicle had been vandalized, she "was told that she could park in a lot so far from her worksite that she would have to ride a shuttle to get to her job, that she could call for an escort to her vehicle every time she needed to go to her vehicle, or she could call 911 if she ever encountered a dangerous situation."  [*Id.* at 13 (citation omitted)].  Plaintiff further states that "[n]one of these suggestions guarantee her safety and the latter suggestions do nothing to prevent her vehicle from further vandalism."  [*Id.*].  These assertions do not create a dispute as to Plaintiff's reasoning, as supported by her deposition, for why she elected not to park on the NREL campus.

38.     Mr. Holden has held the job title Researcher III since 2019; has been a PI on projects at Alliance; and has had publications every year from 2017 to 2020.  [Doc. 30 at ¶¶ 58–59; Doc. 44 at ¶¶ 58–59; Doc. 30-1 at 120:1–7; Doc. 30-29 at 19:21–23, 20:4–22:1; Doc. 30-30].[9]

39.     Dr. Wang has no knowledge of Mr. Young's job position or level at Alliance, and likewise has not identified how Mr. Young's job was similar to hers.  [Doc. 30 at ¶ 61; Doc. 44 at ¶ 61; Doc. 30-1 at 110:25–111:12, 132:8–133:16].

40.     During her employment with Alliance, Dr. Wang was never a PI on a project for which the NREL had already successfully secured funding.  [Doc. 30-1 at 119:21–25; Doc. 45 at ¶ 62; Doc. 45-1 at 63:4–65:12].[10]

41.     Dr. Wang had two publications in 2017, and none between 2018 and 2019.  [Doc. 30 at ¶ 63; Doc. 44 at ¶ 63; Doc. 30-1 at 84:21–85:1; Doc. 30-31].[11]

42.     Alliance has a limited budget to cover overhead funding.  [Doc. 30 at ¶ 64; Doc. 44 at ¶ 64; Doc. 30-1 at 75:3–4; Doc. 30-10 at 110:1–111:8].

43.     Throughout his employment with Alliance, Mr. Holden has used overhead funding for an estimated 1% of his billed time.  [Doc. 30 at ¶ 60; Doc. 44 at ¶ 60; Doc. 30-29 at 22:8–17].

---

[9] Defendant states that Mr. Holden "had publications  every year from 2016-2020," [Doc. 30 at 9], and Plaintiff does not dispute this assertion, [Doc. 44 at 9].  However, the exhibit Defendant cites for support, [Doc. 30-30], does not list any publications before 2017.  *See* [*id.*].

[10] In her Response, Dr. Wang disputes that she was "never a PI during her employment at Alliance" on the basis that she "ha[d] to be a PI in order to apply for funding right before her termination." [Doc. 44 at 13–14].  On Reply, however, Alliance explains—citing Plaintiff's deposition for support—that "[t]here is a distinction between a [PI] . . . that is listed on an application for funding and one that is successful in securing funding for projects and takes on the responsibility of running the funded project."  [Doc. 45 at 5 (citing [Doc. 45-1 at 63:4–65:12])].

[11] Alliance states that Dr. Wang had no publications "in 2018-2020," [Doc. 30 at 9], and Dr. Wang does not dispute this assertion, [Doc. 44 at 9].  However, the exhibit Alliance cites for support includes, under the list of "NREL Publications," a 2020 presentation by, among others, Dr. Wang, [Doc. 30-31 at 2], and Alliance fails to make any distinction between presentations or other types of publications.

44.    Dr. Wang charged more overhead than any other employee who reported to Mr. Gonder.  [Doc. 30 at ¶ 65; Doc. 44 at ¶ 65; Doc. 30-10 at 110:1–111:8].

45.    At the time of her termination, Dr. Wang's salary as Researcher II ranged between approximately $91,000 and $93,385.  [Doc. 30 at ¶ 66; Doc. 30-1 at 176:11–13; Doc. 44 at 14; Doc. 45 at 6].

46.    Mr. Holden's salary at the time of Dr. Wang's termination was $97,382.53.  [Doc. 44 at 14; Doc. 45 at 6; Doc. 44-1 at 102].

47.    At the time of her termination, Dr. Wang was the only employee under Mr. Gonder who had received a "Needs Improvement" rating on a performance review or was placed on a PIP. [Doc. 30 at ¶ 68; Doc. 44 at ¶ 68; Doc. 30-1 at 99:10–14, 109:12–16].

## ANALYSIS

Alliance seeks summary judgment on four grounds.  First, Alliance argues that Dr. Wang failed to properly exhaust administrative remedies with respect to any claims based on allegations from the First Charge, and any discrete acts of discrimination alleged in the Second Charge.  [Doc. 30 at 11].  Second, Alliance contends that Dr. Wang cannot establish her Title VII and Section 1981 discrimination claims based on race, ancestry, ethnicity, color and national origin.  [*Id.* at 12–16].  Third, Alliance argues that Dr. Wang cannot establish her Title VII sex and sex-based pay discrimination claims.  [*Id.* at 16–19].  Fourth, Alliance contends that Dr. Wang cannot establish her retaliation claims.  [*Id.* at 19–20].

## I.    Exhaustion of Administrative Remedies

Alliance first argues that Dr. Wang failed to exhaust her administrative remedies with respect to her Title VII discrimination claims.  Under Title VII, a plaintiff must file a timely employment discrimination charge before filing suit.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)); *Hansen v. SkyWest Airlines*, 844

F.3d 914, 922 (10th Cir. 2016).  The statute sets forth the parameters for filing a charge related to an unlawful employment practice as follows:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . such charge shall be filed by or on behalf of the person aggrieved *within three hundred days after the alleged unlawful employment practice occurred.*

42 U.S.C. § 2000e-5(e)(1) (emphasis added).  This rule "requires a Title VII plaintiff to exhaust administrative remedies for each individual discriminatory or retaliatory act." *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  Although a plaintiff may allege that numerous discriminatory or retaliatory acts occurred throughout her term of employment, "only incidents that took place within the timely filing period are actionable." *Morgan*, 536 U.S. at 114.  In other words, "each discrete incident of [discriminatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018).  The United States Supreme Court ("Supreme Court" or the "Court") has explained that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" because "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 114.  Further, because failure to exhaust is a mandatory claim-processing rule, "the court must enforce this exhaustion requirement if the employer properly raises it." *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020).

Here, Alliance first argues that Dr. Wang did not file suit within ninety days of the dismissal of her First Charge on September 27, 2019, and therefore "she is now time-barred in this litigation from pursuing any alleged discrimination addressed in" the First Charge. [Doc. 30 at 10].  Second, with respect to the Second Charge, Alliance argues that (a) Dr. Wang failed to allege

14

discrimination based on *color* in the Second Charge or Amended Complaint; and (b) any "allegations underlying Dr. Wang's claims of race, sex, national origin, and retaliation are time-barred to the extent they occurred before July 3, 2019," which is 300 days before the Second Charge was filed. [*Id.* at 11].

### A.      Color Discrimination

As an initial matter, Plaintiff does not distinguish her allegations between any of the foregoing protected categories under Title VII. *See, e.g.*, [Doc. 6 at ¶¶ 122, 146 ("Alliance discriminated against Wang by terminating her employment because of . . . her protected class of race, ancestry, ethnicity, color, and/or national origin"). With respect to Dr. Wang's Title VII discrimination claim on the basis of color, however, Dr. Wang cannot dispute that none of her EEO Charges of Discrimination allege discrimination based on color. *See* [Doc. 30 at ¶ 42; Doc. 44 at ¶ 42]; *see also* [Doc. 30-15; Doc. 30-17; Doc. 30-18; Doc. 30-19; Doc. 30-20; Doc. 30-24]. Accordingly, the Court finds that Dr. Wang has failed to exhaust her administrative remedies with respect to her allegations of discrimination based on color.

### B.      Allegations in the First Charge

Alliance argues that Dr. Wang is time-barred "from pursuing any alleged discrimination addressed" in the First Charge because she did not file suit within 90 days of receiving the EEOC dismissal of that charge on September 27, 2019. [Doc. 30 at 10]. There is no dispute that Dr. Wang filed suit on December 23, 2020—more than 90 days after her First Charge was dismissed. *See* [Doc. 1]. The relevant question, therefore, is whether Dr. Wang relies on any of the discrete discriminatory acts alleged in the First Charge as the basis for Title VII claims in this action.

In the First Charge, as amended, dated April 10, 2019, Dr. Wang alleges discrimination on the basis of race and national origin, as well as a hostile work environment and retaliation, [Doc. 30-19 at 2], based on the following events, among others: (1) failing to receive a promotion to

Researcher IV in or around 2016–2017; (2) receiving three "Needs Improvement" ratings in December 2017 ("FY2017 Review"), August 2018 ("2018 Mid-Year Review"), and December 2018 ("FY2018 Review"), including the various comments noted in those reviews; (3) being placed on the PIP in December 2018; and (4) vandalism to her vehicle.  *See* [*id.* at 2–5]; *see also* [Doc. 30-18 at 7].  In her Response to the instant Motion, Dr. Wang identifies eight actions she contends constitute adverse employment actions that Alliance took against her:

> (1) she was issued a poor rating on her 2017 Performance Feedback and Development Plan; (2) she was issued a poor rating on her 2018 Mid-Year Review; (3) she was issued a poor rating on her 2018 Performance Feedback and Development Plan; (4) she was put on a Performance Improvement Plan; (5) her vehicle was repeatedly vandalized in the parking lot that she parked in for work; (6) she was issued a poor rating on her 2019 Performance Feedback and Development Plan; (7) she was demoted from a Researcher III to a Researcher II; and (8) the Company ultimately terminated her from her employment.

[Doc. 44 at 19].  Among these actions, nos. 1–5 were contained in the First Charge.  *Compare* [*id.*] *with* [Doc. 30-19 at 2–5; Doc. 30-18 at 7].    The remaining three actions—the "Needs Improvement" rating on her FY2019 Review, her demotion to Researcher II in January 2020, and her employment termination in July 2020—were not subjects of her First Charge, nor could they have been.  Thus, the Court finds that Dr. Wang's Title VII discrimination claims in this case (Counts III, IV, and VI) are time-barred insofar as they are based on any discrete actions in the First Charge—namely, (1) her "Needs Improvement" performance ratings in 2017 and 2018; (2) her placement on a PIP in 2018; and (3) the vandalism to her vehicle on or *before* April 10, 2019, the day she filed the First Charge.

### C.    Allegations in the Second Charge

With respect to the Second Charge, Alliance argues that because Dr. Wang filed the Second Charge on April 28, 2020, any "alleged events that occurred before July 3, 2019, or 300 days before the Second Charge was filed, are time-barred."  [Doc. 30 at 10–11].  Alliance also asserts

that "many allegations that pre-date July 3, 2019 were addressed in" the First Charge.   [*Id.*].   The Court respectfully agrees.

In her Second Charge, Dr. Wang alleges discrimination based on race, sex/sex-based pay, and national origin, as well as retaliation.  *See* [Doc. 30-24 at 2].   The Second Charge includes allegations regarding events addressed in the First Charge *and* which occurred more than 300 days before she filed the Second Charge, which include her (1) FY2017 Review, (2) 2018 Mid-Year Review, (3) FY2018 Review, and (4) PIP in 2018.  [*Id.* at 3–5].   Thus, Dr. Wang's Title VII discrimination claims under Counts II, IV, and VI remain time-barred insofar as they are based on any of these events.

Dr. Wang also alleges in the Second Charge that her vehicle was vandalized "on multiple occasions while parked at NREL *during the second half of 2019*."  [*Id.* at 7 (emphasis added)]. Although Dr. Wang referenced vandalism to her vehicle in the First Charge, *see* [Doc. 30-18 at 7; Doc. 30-19 at 5], that First Charge did not address any vandalism during the second half of 2019, nor could it have.[12]  *See* [Doc. 6 at ¶¶ 78, 84 (alleging she discovered vandalism to her vehicle in late July and September 2019)].   Thus, Dr. Wang properly exhausted her administrative remedies with respect to allegations of vandalism to her vehicle in the second half of 2019.

In sum, the Court finds that Dr. Wang properly exhausted her administrative remedies for her Title VII discrimination claims (Counts III, IV, and VI) only with respect to her allegations of discrimination on the basis of race, sex/sex-based pay, and national origin (including ancestry and ethnicity),[13] based on events identified in the Second Charge that occurred between July 3, 2019

---

[12] The First Charge was filed during the first half of 2019.  *See* [Doc. 30-15; Doc. 30-17; Doc. 30-18; Doc. 30-19].

[13] Title VII does not expressly mention discrimination based on ancestry or ethnicity.  *See* 42 U.S.C. § 2000e-2(a)(1) ("race, color, religion, sex, or national origin").   However, the Court finds

and April 28, 2020—300 days before she filed the Second Charge and the date she filed it, respectively.[14]

### D.      Plaintiff's Objections

In her Response, Dr. Wang argues that she properly exhausted her administrative remedies before filing suit on the grounds that she suffered "ongoing harassment" at Alliance, and the Court may consider "allegations of discrimination reasonably related to the allegations listed in the administrative charge, including new acts occurring during the pendency of the administrative charge." [Doc. 44 at 16]. Thus, Plaintiff continues, the Court should not dismiss her Title VII claims on the basis of color, race, and national origin because "they are not time-barred due to the ongoing harassment Dr. Wang suffered." [*Id.* at 17]. Respectfully, Plaintiff's argument is misplaced.

To be sure, the foregoing line of argument appears to invoke the continuing violation doctrine, which "allows courts to consider conduct that would ordinarily be time barred as long as

---

that Plaintiff's references to these characteristics refer equally to her claims of race and/or national origin discrimination. *See St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that ancestry and national original "are identical as a factual matter" and "national origin claims have been treated as ancestry or ethnicity claims in some circumstances," including, "[f]or example, in the Title VII context, [where] the terms overlap as a legal matter"); *see also Maes v. Leprino Foods Co., Inc.*, No. 15-cv-00022-WJM-MEH, 2016 WL 8487921, at *5 (D. Colo. Sept. 16, 2016) (combining analysis of national origin and "ethnicity discrimination" claims); *Andalib v. JBS USA, LLC*, No. 18-cv-02118-MSK-KLM, 2019 WL 2544072, at *3 (D. Colo. June 20, 2019) (identifying ethnicity discrimination was a "cognate[] of" race, color, or national origin).

[14] Finally, the Court notes that Alliance does not argue that Dr. Wang failed to exhaust her administrative remedies with respect to her termination. Dr. Wang's Second Charge could not have captured her termination given that she filed the Second Charge on April 28, 2020, *see* [Doc. 30-24 at 2], and was terminated more than two months later on July 8, 2020, *see* [Doc. 30-14]. A timely filing of a charge of discrimination is an affirmative defense and not a jurisdictional bar to suit. *See Lincoln*, 900 F.3d at 1181–86. Accordingly, this Court finds that Dr. Wang's claims with respect to her termination are not time-barred.

the untimely incidents represent an *ongoing* unlawful employment practice." *Morgan*, 536 U.S. at 107 (emphasis added) (internal quotation marks and citation omitted). Nevertheless, in making her argument, Dr. Wang also appears to confuse whether the Court may consider unexhausted acts as *background evidence* in support of her *timely* claims with whether she may seek relief in this action based solely upon those unexhausted acts.

The Court agrees that it may consider unexhausted acts as background evidence in support of a timely asserted discrimination claim. *See id.* at 113 (stating that failing to exhaust administrative remedies does not "bar an employee from using the prior acts as background evidence in support of a timely claim"); *Pathak v. Fedex Trade Networks T and B Inc.*, 329 F. Supp. 3d 1263, 1277 (D. Colo. 2018) ("I may consider the unexhausted acts as evidence that FedEx terminated and failed to promote Mr. Pathak for discriminatory reasons.").

However, in *Morgan*, the United States Supreme Court "abrogate[d] the continuing violation doctrine as previously applied to claims of discriminatory . . . actions by employers, and replace[d] it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Potter*, 347 F.3d at 1210 (citing *Morgan*, 536 U.S. at 110–13). Significantly, the Supreme Court also distinguished Title VII *discrimination* claims—which are based on "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire"—from Title VII *hostile work environment* claims, which are composed of "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114, 117.

Here, although Dr. Wang references "ongoing harassment" in her Response, [Doc. 44 at 16–17], she does not allege a hostile work environment theory of discrimination under Title VII

in the First Amended Complaint, *see* [Doc. 6].[15]   Thus, the continuing violation doctrine is inapplicable to Dr. Wang's Title VII discrimination claims in this case; and the acts for which she failed to exhaust her administrative remedies discussed above remain time-barred.

## II.   Dr. Wang Cannot Establish Her Race, Ancestry, Ethnicity, or National Origin Discrimination Claims Under Title VII or Section 1981 (Counts III and I, respectively).

The elements of Dr. Wang's discrimination claims based on race, ancestry, ethnicity, and national origin are substantially the same whether they are asserted under Title VII or Section 1981.  *See Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005).  The Parties agree that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  [Doc. 30 at 12; Doc. 44 at 17–18].  Under that standard, a plaintiff "bears the initial burden to establish her prima facie case of . . . discrimination, which varies depending on the type of adverse action the employee alleges was discriminatory."  *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007); *see also Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.").  In this context, to make her prima facie case, a plaintiff must establish that (1) she is a member of a protected class, (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *PVNF*, 487 F.3d at 800.  It is the plaintiff's burden to prove her prima facie case "by a preponderance of the evidence."  *Plotke*, 405 F.3d at 1099; *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008) (explaining that the "elements of a prima facie case under the *McDonnell Douglas* framework are neither rigid nor mechanistic, [and]

---

[15] Indeed, nowhere in the First Amended Complaint does she mention the term "harassment" or "hostile work environment."

their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in [the] plaintiff's favor"). If the plaintiff establishes her prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *PVNF*, 487 F.3d at 800. If the employer is able to do so, "then the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.* The Court will address Plaintiff's Title VII and Section 1981 claims in turn.

### A.    Title VII Discrimination Claim (Count III)

Alliance argues that Dr. Wang cannot establish the fourth element of her prima facie case—an adverse employment action that took place under circumstances giving rise to an inference of discrimination. *See* [Doc. 30 at 13–14]. As discussed above, Dr. Wang identifies eight actions she contends constitute adverse employment actions that Alliance took against her, *see* [Doc. 44 at 19], and she properly exhausted her Title VII claim under Count III only with respect to her allegations of discrimination on the basis of race and national origin (including ancestry and ethnicity), based on events identified in the Second Charge that occurred between July 3, 2019 and April 28, 2020, the day she filed the Second Charge. Those events include (1) her vehicle was vandalized in the parking lot in the latter half of 2019; (2) she was issued a "Needs Improvement" rating on her FY2019 Review; and (3) she was demoted from a Researcher III to a Researcher II in January 2020. In addition, as discussed above, Defendant did not argue that Dr. Wang's challenge to her July 8, 2020 termination was barred due to failure to exhaust her administrative remedies.

***Vehicle Vandalism.*** Dr. Wang argues she was "targeted" for repeated acts of vandalism to her vehicle on the basis that "no other individual that worked for the Company suffered damage

to their vehicle when they parked in the parking lot." [Doc. 44 at 21].[16]  She claims that Alliance refused to investigate to determine who was responsible for vandalizing her vehicle; and that after she installed a video camera to her vehicle and notified "her workplace" about the camera, "her vehicle was never vandalized again."  [*Id.*].  Dr. Wang contends that "[t]his leads to the strong inference that it was someone in her workplace that was vandalizing her vehicle."  [*Id.*].  Dr. Wang's arguments here fail for several reasons.

First, it is undisputed that Alliance did not own the parking lot at issue.  [Doc. 30 at ¶ 47; Doc. 44 at ¶ 47].  Second, it is undisputed that Dr. Wang does not know who caused damage to her vehicle while it was parked in the parking lot.  [Doc. 30 at ¶ 51; Doc. 44 at ¶ 51].  Third, even if Dr. Wang knew the identity of the person(s) who caused damage to her vehicle, she fails to (a) make any connection between that person and the individual(s) "she told at her workplace about her new video camera," [*id.* at 21]; or (b) *who* at her workplace she notified about the camera or their connection to this case.  Moreover, and most significantly, Dr. Wang fails to make any argument, let alone adduce any evidence, connecting her assertion that "someone in her workplace . . . was vandalizing her vehicle" with her burden of establishing that any action she experienced was based on her race, ancestry, ethnicity, or national origin.  In sum, Dr. Wang fails to establish a prima facie case for her Title VII discrimination claim under Count III based on vandalism to her vehicle.

**FY2019 "Needs Improvement" Rating and Demotion.**  As a preliminary matter, the Court notes that Dr. Wang's Response presumes that she has already established the fourth element of

---

[16] In the Complaint, Dr. Wang identifies two events that occurred during the 300-day period before she filed the Second Charge: "[o]n July 24, 2019, Wang's right-front tire on her car was slashed while she was parked at Alliance," and "[o]n September 10, 2019, Wang's car was keyed while parked at Alliance."  [Doc. 6 at ¶¶ 78, 84].

her prima facie case and Alliance has met its burden of providing a nondiscriminatory reason(s) for its actions regarding Plaintiff's performance. *See* [Doc. 44 at 19–21]. As a result, the Response appears to focus only on whether Dr. Wang can show there is a genuine issue of material fact as to whether Alliance's proffered reasons are pretextual. *See, e.g.*, [*id.* at 20 (arguing that "Dr. Wang's ability to communication was never an issue during her previous years with the Company," and therefore "the explanation that her performance was so bad as to warrant these reviews falls flat").

The Tenth Circuit has "noted that the fourth element of the prima facie burden applicable in cases like this involves an inquiry similar to the one surrounding a plaintiff's burden of demonstrating pretext." *Baltazar v. Shinseki*, 485 F. App'x 941, 946 (10th Cir. 2012) (citation omitted); *see also Sorbo v. UPS*, 432 F.3d 1169, 1173 n.5 (10th Cir. 2005) (explaining there exists a "tension in our case law" between cases that "treat circumstances suggestive of discrimination as an element of the prima facie case, [and] other cases [that] truncate the prima facie case to require only the basic showing that the plaintiff was qualified for his job and treat the surrounding circumstances—including alleged misconduct of the plaintiff—as part of the analytically subsequent inquiry into the employer's stated basis for the adverse action and the plaintiff's opposing demonstration of pretext"). In any event, this Court need not resolve whether it should analyze Dr. Wang's arguments by reference to the prima facie case or the pretext inquiry because her "evidence of discrimination/pretext fails as a matter of law." *Sorbo*, 432 F.3d at 1174; *cf. Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999) ("[A]n employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors.").

Here, Alliance cites Dr. Wang's performance issues—including those identified in her prior FY2017 and FY2018 Reviews—as the basis for her "Needs Improvement" rating in her FY2019 Review, as well as her demotion in 2020. *See* [Doc. 30 at 14–15]. A plaintiff can show pretext "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011). "[M]ere conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 864–65 (10th Cir. 2007).

In her Response, Dr. Wang contends that her negative performance reviews "were centered on the fact that Mr. Gonder believed that she had poor communication skills." [Doc. 44 at 19].[17] Notably, she insists that Mr. Gonder's references to her "inability to communicate" demonstrate that "her accent and the fact that English was her second language [w]as a motivating factor for his discriminatory behavior." [*Id.* at 20]. Dr. Wang also claims that such communication issues arose only after Mr. Gonder began supervising her work, on the grounds that "she had not received poor ratings . . . due to her inability to communicate" on prior reviews. [*Id.* at 19–20]. Therefore, Dr. Wang's argument continues, since concerns surrounding her communication were "never an

---

[17] Dr. Wang does not make separate arguments with respect to her FY2019 performance rating and her other performance ratings. Rather, she discusses her FY2017, FY2018, and FY2019 Reviews collectively. *See* [Doc. 44 at 19]; *see also* [Doc. 44-1 at 4–26]. Likewise, Dr. Wang does not make separate arguments generally with respect to her performance reviews, demotion, and termination. Rather, she relies on her arguments that her low performance reviews were, themselves, discriminatory (i.e., based on her accent and the fact that English is her second language) to support her conclusion that Alliance should not have relied on those reviews in making its demotion and termination decisions. *See, e.g.*, [Doc. 44 at 20–21].

issue" during her employment, "the explanation that her performance was so bad as to warrant" the "Needs Improvement" ratings "falls flat." [*Id.* at 20].

Although courts have held that "an employer's comments regarding a plaintiff's accent may constitute circumstantial evidence of discrimination based on national origin," *Zokari v. Gates*, 561 F.3d 1076, 1090 (10th Cir. 2009), this Court is not persuaded by Dr. Wang's arguments for several reasons. First, Dr. Wang does not argue that the assessments of her performance regarding her communication in her FY2019 Review are false, much less pretext for discrimination, and she does not challenge Alliance's assertion that a researcher must be able to communicate effectively regarding the nature of her work.

Second, Dr. Wang fails to cite sufficient evidence for a factfinder to conclude that the negative feedback she received regarding her communication skills related in any way to her accent or the fact that English is her second language. Indeed, it is undisputed that Dr. Wang stated that "no person at Alliance ever used the words 'English language' when discussing her communications skills." [Doc. 44 at ¶ 45]. Dr. Wang also does not cite any evidence to support her conclusion that Mr. Gonder evaluated her performance unfairly based on any discriminatory animus toward her. *Compare Shah v. Okla., ex rel. Okla. Dept. of Mental Health and Substance Abuse*, 485 F. App'x 971, 975 (10th Cir. 2012) (concluding that no evidence suggested the adverse employment decision was based on the plaintiff's accent, race, or national origin where no evidence of critical comments regarding his accent appeared in the record and no evidence suggested the employer's reasons were a pretext for discrimination) *with Pathak*, 329 F. Supp. 3d at 1279 (finding the plaintiff sufficiently overcame summary judgment by proffering evidence indicating that the employer's reason for denying the plaintiff's promotion was false, including

that the plaintiff's manager "told him he did not receive the supervisor promotion because of his Indian accent").

Further, evidence cited by Dr. Wang does not support her position that the communication issues reflected in her feedback were based on her accent or use of English as her second language. Indeed, Dr. Wang's warnings about her declining performance predate the FY2019 Review.  For instance, Dr. Wang references her FY2017 Review, wherein, among other areas for improvement, Mr. Gonder explained the specific communication issues he perceived from Dr. Wang:

> Across the projects she supports, communication continues to be a needed area of improvement—both in fully understanding what is being asked of her and in presenting her results.  I would also like to see Joann demonstrate a stronger ability to grasp the big picture and to adapt solutions and deliverables to a target audience or client.  In addition, some of Joann's colleagues have communicated their perception that she does not always seem to appreciate real-world constraints that should be placed on her models, and that it sometimes takes many meetings and extensive iteration to get Joann's work products to the point where a project team is comfortable with them.
>
> . . .
>
> In summary, while Joann does deliver the base level technical outputs for defined requests, there are several performance improvements that I would like to see from her—specifically in the areas of communication, better understanding and articulating medium- and high-level research questions, tailoring her detailed-level work to the higher-level questions and producing fully-developed solutions, and clearly demonstrating the value of these solutions for existing and new funding opportunities.  While Joann has good technical skills to complete specific project tasks, further developing and demonstrating these higher-level skills for communication, understanding sponsor and customer motivations and customizing research solutions in response will greatly increase the value she brings to the projects that she supports.

[Doc. 44-1 at 7].  In that same review, Dr. Wang responded to the feedback, including that she "appreciate[d] the need for good communication" and would make efforts to improve.  [*Id.* at 10]; *see also* [*id.* at 11 ("I appreciate the feedback from Kevin and Jeff [Gonder] about what they want to see from me in terms of developing a research plan that communicates my level of understanding of a given problem that can be shared with my peers. . . .  In response to manager's feedback I

endeavor . . . to improve in the areas of communication, articulating research questions, and demonstrating how these solutions research to funding opportunities.")].

Dr. Wang also references her FY2018 Review, wherein Mr. Gonder again summarized her communication issues as follows:

- I appreciate the effort Joann is putting in to prepare slides and practice giving presentations, but she continues to struggle with descriptive communication and clear language (which can cause misinterpretation of what she is saying or presenting, particularly by those unfamiliar with the topic area). She also has further progress to make on clearly articulating the big-picture relevance of her work and providing a compelling narrative of how her detailed work supports the big picture.
- Written and verbal communication clarity (such as in e-mails and in meetings/discussions with colleagues) remains a challenge with Joann. I have observed myself occasions where Joann did not seem to be correctly understanding items being discussed, and comments from co-workers continue to reinforce this (e.g., "impression we were talking past each other", "took time to understand what I was looking for" and "ended up being easier to do the work myself"). I have received comments on Joann being "resistive to feedback on alternative approaches," though I wonder if that may also be due to challenges with communication and precisely understanding what is being discussed.
- A final communication-related request is for Joann to please keep conversations she is having in her office less noisy (and/or to close her door during the phone/in-person conversations).

[*Id.* at 16]. And then, in her FY2019 Review, which is at issue here, Mr. Gonder noted that Dr. Wang "ha[d] clearly worked hard during FY19 in response to the performance feedback" identified in her FY2017 Review, FY2018 Review, and PIP, and "her efforts ha[d] produced some positive and useful results." [*Id.* at 22]. "However," Mr. Gonder continued, "as a world-class research laboratory, NREL has high expectations for staff at the Researcher III level and Joann is

unfortunately still not meeting those expectations." [*Id.*].[18]  Moreover, there is no dispute that the "Needs Improvement" rating in Dr. Wang's FY2019 Review was her *third* consecutive time receiving such a rating.  *See* [Doc. 44 at 4–5; Doc. 30-6; Doc. 30-7; Doc. 30-8; Doc. 30-12].

In other words, Dr. Wang fails to show that her "Needs Improvement" rating in the FY2019 Review was anything more than a repetition of her previous ratings for the same performance issues that already existed.  *See, e.g.*, [Doc. 30-12 at 4 (noting that "[a]fter receiving 'needs improvement' performance ratings in FY17 and FY18 Joann was placed on a Performance Improvement Plan (PIP) during FY 2019" and Dr. Wang was "unfortunately still not meeting those expectations"); *cf. Foreman v. W. Freightways, LLC*, 958 F. Supp. 2d 1270, 1285 (D. Colo. 2013) (finding that an employee's PIP was not an adverse action where the employee had already been previously warned of performance issues that he needed to correct).  None of the information in the performance reviews referenced by Dr. Wang indicates that Mr. Gonder or anyone else at Alliance criticized her communication based on her accent or use of English as a second language. Dr. Wang fails to identify sufficient evidence to show that Alliance's reasons for providing her the

---

[18] Among Mr. Gonder's numerous comments, he also noted that "[c]hallenges with communication and apparent level of understanding also remain, as illustrated by examples such as Joann's treatment of CVT and 'e-CVT' transmissions in the FASTSim enhancements effort and in the recent discussions surrounding how her fuel consumption estimation algorithm relates to RouteE." [Doc. 44-1 at 22].  This feedback reflects concerns regarding Dr. Wang's substantive analysis, rather than concerns regarding an accent.

feedback in her FY2019 Review, and the subsequent demotion which was based on her performance issues, were pretextual.[19]

In addition, Dr. Wang states that her "poor performance was attributed to work that she did as part of a group." [Doc. 44 at 20]. She then attempts to establish pretext by arguing that she was "singled out by Mr. Gonder for her contribution to [the] group project," but "[h]ad she not been singled out, surely at least one (1) other individual would have" also received a negative performance review or been placed on a PIP "due to the group's inability to meet the deadlines set to complete the project." [*Id.*]. Dr. Wang similarly asserts that Alliance improperly relied upon her "performance issues [that] were based on discriminatory reasoning" because of Mr. Gonder's "discriminatory animus towards Dr. Wang." [*Id.* at 20–21]. Therefore, her argument continues, "the Company cannot show that the determination to terminate Dr. Wang is not free of discrimination." [*Id.* at 21]. Again, however, Dr. Wang fails to provide any evidentiary support for her assertion that she was singled out and her "poor performance was attributed to work that she did as part of a group," [*id.* at 20], apart from her citation to Paragraph 37 in the First Amended Complaint, *see* [*id.*], which is insufficient at the summary judgment stage. *See Bones*, 366 F.3d at 875; *see also* [Doc. 6 at ¶ 37 ("In Wang's 2017 performance review, Gonder attributed the negative

---

[19] In response to feedback in her FY2019 Review regarding persisting "[c]hallenges with communication and apparent level of understanding," [Doc. 44-1 at 22], it is Dr. Wang—not Alliance—who referenced her use of the English language, stating, "I understand that my communication in English can sometimes be difficult but I am always working on that," [*id.* at 25]. Even drawing all inferences in her favor, this Court concludes that Dr. Wang's own statement is insufficient to create a genuine issue of material fact that her adverse employment actions took place under circumstances giving rise to an inference of discrimination. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.") And even if the Court presumes that Dr. Wang has established a prima facie case of discrimination based on her race, ancestry, ethnicity, or national origin, as explained herein, she cannot establish pretext. *Id.*

issues the SMART Multi-Modal project to Wang, even though it was a group project.")].  In any event, as explained above, Dr. Wang has failed to adduce sufficient evidence to establish, by a preponderance of the evidence, her position that "her performance issues were based on discriminatory reasoning" or that Mr. Gonder had a discriminatory animus towards her which, in turn, led to a discriminatory demotion.  [Doc. 44 at 21].  She also does not claim that any of the information in her performance reviews, particularly that which did not relate to her communication, was false or lacked any basis.  *See* [*id.*].[20]

**Termination.**  The only challenged action that remains is Dr. Wang's termination.  As noted above, Dr. Wang does not make separate arguments with respect to her termination.  Rather, she relies on her arguments that her low performance reviews were, themselves, discriminatory (i.e., based on her accent and the fact that English is her second language) to support her position that Alliance should not have relied on those reviews in making its termination decision.  *See* [*id.* at 20–21].  However, the Court has determined that Dr. Wang fails to adduce sufficient evidence to raise a genuine dispute of material fact regarding Alliance's nondiscriminatory reasons for her negative performance ratings.  Thus, this conclusion applies equally to her termination.  In addition, although Dr. Wang references Alliance's reasons for termination identified in her termination letter, *see* [*id.* at 21], she again does not claim that any of the information in the termination letter was false.  *See* [*id.*].  Nor could she, given the limited reasons stated in the letter:

---

[20] In her Response, Dr. Wang states "[i]t is important to learn all of the reasons as to why the Company demoted Dr. Wang as she alleges that [her] demotion was part of a pattern of discrimination."  [Doc. 44 at 11].  This statement is puzzling to the Court, given the time to learn this information was during discovery, and that deadline passed on November 17, 2021.  *See* [Doc. 20 at 14].  She also fails to seek further discovery pursuant to Federal Rule of Civil Procedure 56(d).  *See* Fed. R. Civ. P. 56(d) (stating that a nonmovant may show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition").  Nor has Plaintiff raised a discrimination claim based on an alleged larger pattern and practice.

> Over the past 18 months, your Manager, Jeff Gonder, has formally worked with you regarding continued performance issues. Due to these continued concerns and insufficient demonstration of improvement, the decision was made to terminate your employment effective immediately.

[Doc. 44-1 at 84].

In sum, Dr. Wang fails to raise a genuine dispute of material fact regarding Alliance's nondiscriminatory reasons for the feedback in her FY2019 Review or her subsequent demotion and termination. Accordingly, Alliance is entitled to summary judgment on Dr. Wang's Title VII discrimination claim under Count III.

### B.      Section 1981 Discrimination Claim (Count I)

As discussed above, Dr. Wang identifies eight actions she contends constitute adverse employment actions that Alliance took against her:

> (1) she was issued a poor rating on her 2017 Performance Feedback and Development Plan; (2) she was issued a poor rating on her 2018 Mid-Year Review; (3) she was issued a poor rating on her 2018 Performance Feedback and Development Plan; (4) she was put on a Performance Improvement Plan; (5) her vehicle was repeatedly vandalized in the parking lot that she parked in for work; (6) she was issued a poor rating on her 2019 Performance Feedback and Development Plan; (7) she was demoted from a Researcher III to a Researcher II; and (8) the Company ultimately terminated her from her employment.

[Doc. 44 at 19].

Discrimination claims under Section 1981 and Title VII are analyzed under the same legal standards. *See Baca*, 398 F.3d at 1218 n.3. Here, there are no material differences between the allegations supporting Plaintiff's Section 1981 discrimination claim based on race, ancestry, ethnicity, color, and national origin under Count I, and her Title VII claims based on race, ancestry, ethnicity, and national origin under Count III. *See* [Doc. 6 at ¶¶ 118–27; 142–50]; *see also Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991) ("The concept of race under § 1981 is broad. It extends to matters of ancestry which are normally associated with nationality, not race in a biological sense."); *Andalib*, 2019 WL 2544072, at *3 (identifying

ethnicity discrimination was a "cognate[] of" race, color, or national origin).  Unlike Title VII, however, a plaintiff is not required to exhaust administrative remedies before filing suit alleging discrimination under Section 1981.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 n.9 (10th Cir. 1997).  Thus, the Court considers the merits of Plaintiff's Section 1981 discrimination claim under Count I insofar as the analysis above with respect to Plaintiff's Title VII discrimination claim under Count III does not address any discrete actions that Plaintiff failed to exhaust, and therefore is precluded from raising, under that Count.  *See supra* Part I.

All but one of the eight alleged adverse actions identified by Dr. Wang—namely, nos. 1–4 and nos. 6–8—relate to Alliance's assessments of Dr. Wang's performance, including actions Alliance took against her based on those assessments (i.e., negative performance reviews, placement on a PIP, demotion, and termination).  The final action relates to the vandalism to Dr. Wang's vehicle.  Therefore, the Court will first address the arguments regarding vandalism, and then turn the remaining actions concerning Plaintiff's performance and resulting actions.

***Vehicle Vandalism.***  The only distinction between Dr. Wang's allegations of vandalism related to her Section 1981 claim and her Title VII claim is that her Section 1981 claim includes vandalism that occurred before July 3, 2019 (i.e., 300 days before she filed the Second Charge), including the profane business card left on her vehicle.  *See* [Doc. 6 at ¶¶ 58–59].  However, the Parties' arguments fail to distinguish between any of these events, and the Court likewise finds that any such distinction would make no difference to their resolution.  It is undisputed that Alliance did not own the parking lot at issue, and Dr. Wang does not know who left the business card on her car or who caused *any* of the damage to her vehicle while it was parked in the parking lot.  [Doc. 30 at ¶¶ 47, 51–52; Doc. 44 at ¶¶ 47, 51–52].  Further, Dr. Wang fails to make any connection between her assertion that "someone in her workplace . . . was vandalizing her vehicle"

with her race, ancestry, ethnicity, color, or national origin.  In sum, Dr. Wang fails to establish a prima facie case for her Section 1981 discrimination claim under Count I based on vandalism to her vehicle.

***Performance Issues and Corresponding Actions Taken by Alliance.***  In addition to the alleged acts of discrimination analyzed above with respect to Plaintiff's Title VII discrimination claim under Count III—i.e., her FY2019 "Needs Improvement" rating and subsequent demotion— the Court's analysis of Plaintiff's Section 1981 claim includes the following actions: (1) she was issued a "Needs Improvement" rating on her FY2017 Review; (2) she was issued a "Needs Improvement" rating on her 2018 Mid-Year Review; (3) she was issued a "Needs Improvement" rating on her FY2018 Review; (4) she was put on the PIP in December 2018; and (5) Alliance ultimately terminated her employment.  *See* [Doc. 44 at 19].  Again, however, these additional acts of alleged discrimination make no difference because Plaintiff fails to meet her burden of proffering any evidence that creates a genuine dispute of material fact regarding Alliance's nondiscriminatory reasons for taking these actions against her.

With respect to the "Needs Improvement" performance ratings, as explained in greater detail above, Dr. Wang fails to adduce evidence of discrimination or pretext suggesting that Mr. Gonder had a discriminatory animus towards her based on her accent or use of the English language, let alone that such animus, in turn, led to the negative performance ratings, the PIP in 2018, or her demotion to Researcher II in 2020.  *See supra* Part II § A.  And she likewise does not claim that any of the information in her performance reviews or PIP was false.  *See* [*id.*].

Finally, as to Dr. Wang's termination, as explained above, she fails to adduce sufficient evidence to raise a genuine dispute of material fact regarding Alliance's nondiscriminatory reasons for her termination.  Accordingly, the Court also finds here that Dr. Wang fails to identify any

evidence to support her claims of discriminatory termination based on race, ancestry, ethnicity, color, or national origin, or to create a genuine dispute of material fact regarding the nondiscriminatory reasons for her negative performance reviews, PIP, demotion, or termination. Therefore, Alliance is entitled to summary judgment on Dr. Wang's Section 1981 discrimination claim under Count I.

### III.   Dr. Wang Cannot Establish Her Claims of Sex and Sex-Based Pay Discrimination Under Title VII (Counts IV and VI, respectively).

Count IV in the First Amended Complaint asserts a claim of sex discrimination, and Count VI asserts a claim of sex-based pay discrimination, both under Title VII. [Doc. 6 at ¶¶ 151–59, 177–84]. As noted above, only Plaintiff's Second Charge alleges discrimination based on sex. *See* [Doc. 30-24]. The Court will begin by addressing Plaintiff's sex-based pay discrimination claim.

#### A.   Sex-Based Pay Discrimination (Count VI)

Dr. Wang's Title VII pay discrimination claim is also analyzed under the *McDonnell Douglas* burden-shifting framework. *See PVNF*, 487 F.3d at 800; *Nazinitsky v. INTEGRIS Baptist Med. Ctr., Inc.*, 852 F. App'x 365, 367 (10th Cir. 2021). In this context, a plaintiff bears the initial burden to establish a prima facie case of sex-based pay discrimination, by showing she "occupies a job similar to that of higher paid males." *Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir. 2015). If she does so, the burden shifts to the employer to proffer non-gender-based reasons for the pay differences; the employer, however, is not required to prove their reasons. *Nazinitsky*, 852 F. App'x at 367. At the final step, the burden shifts back to the plaintiff to show that the employer's reasons are pretext for discrimination. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017).

***Prima Facie Case.***   In her Response, Dr. Wang identifies Eric Wood, Jake Holden, and Stan Young as higher-paid male comparators.  *See* [Doc. 44 at ¶ 55].  However, apart from merely identifying these three individuals, Dr. Wang fails to make any argument with respect to Mr. Wood or Mr. Young.  Instead, she focuses only on Mr. Holden's position and salary.  *See* [*id.* at 14, 22–24].[21]  The Court will therefore do the same here.

As to Mr. Holden, it is undisputed that, at the time of Dr. Wang's termination, Mr. Holden held the job title Researcher III, and his salary was $97,382.53, [*id.* at 14; Doc. 45 at 6; Doc. 44-1 at 102], whereas Dr. Wang held the job title Researcher II, and her salary ranged between approximately $91,000 and $93,385.  [Doc. 30 at ¶ 66; Doc. 30-1 at 176:11–13; Doc. 44 at 14; Doc. 45 at 6].  It is also undisputed, however, that Mr. Holden was promoted to a Researcher III position sometime in 2019, whereas Dr. Wang held the Researcher III position until she was demoted in January 2020.  [Doc. 30 at ¶¶ 26, 58; Doc. 44 at ¶¶ 26, 58].  Thus, Dr. Wang and Mr. Holden both held a Researcher III position for a brief period *after* Mr. Holden's promotion in 2019 and *before* Dr. Wang's demotion in 2020.  *See* [Doc. 44 at 23].  Alliance does not appear to dispute that Dr. Wang has met her prima facie case based on Mr. Holden's position and salary.  *See* [Doc. 45 at 8–9].  Thus, the Court finds that Plaintiff sufficiently establishes her prima facie case of sex-based pay discrimination.

***Facially Nondiscriminatory Justification for Pay Decision.***   The Court next determines whether Alliance proffers non-gender-based reasons for the pay differences.  *See Nazinitsky*, 852 F. App'x at 367.  Alliance argues that Mr. Holden's higher salary was "due to his stronger

---

[21] In any event, it is undisputed that at the time of her termination, Dr. Wang held the job title Researcher II, whereas Mr. Wood was a Researcher IV.  [Doc. 30 at ¶¶ 56, 66; Doc. 44 at ¶¶ 56, 66].  As to Mr. Young, it is undisputed that Dr. Wang has no knowledge of Mr. Young's job position or level at Alliance, and likewise cannot identify how Mr. Young's job was similar to hers.  [Doc. 30 at ¶¶ 61; Doc. 44 at ¶ 61; Doc. 30-1 at 110:25–111:12, 132:8–133:16].

performance reviews" and Mr. Holden was "a superior performer" compared to Dr. Wang. [Doc. 45 at 9]; *see also* [Doc. 30 at 18–19]. This superior performance, according to Alliance, includes the following: (1) that Mr. Holden has been a PI on projects; (2) he published numerous articles between 2017 and 2020; (3) he has "been instrumental in bringing in substantial funding"; (4) he "never relied on overhead funding to cover his research"; and (5) he "never received a Needs Improvement rating." [Doc. 30 at 18–19]. Dr. Wang does not dispute that Alliance made the decision to pay Mr. Holden a higher salary for the above reasons. *See* [Doc. 44 at 23–24]. The Court therefore finds that Alliance has met its burden of providing a facially nondiscriminatory reason for paying Mr. Holden the higher salary.

**Pretext.** To establish pretext on summary judgment, "[a] plaintiff must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual." *DePaula*, 859 F.3d at 970. "A plaintiff can establish pretext by showing the defendant's proffered nondiscriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017). A plaintiff also may do so by establishing that the employer's reason was false, was contrary to company policy, or was applied differently to the plaintiff than other employees. *See DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). But mere conjecture or speculation is not enough. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015). Rather, the Court must examine the facts as they appeared to the person who made the employment decision, and the Court will not second-guess the propriety of that decision if the employer believed its legitimate, nondiscriminatory reasons and acted in good faith on those reasons. *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).

This Court concludes that Dr. Wang has failed to adduce sufficient evidence to establish a genuine issue of material fact as to whether Alliance's legitimate, nondiscriminatory reasons for offering Mr. Holden a higher salary upon his promotion to Researcher III than Dr. Wang earned as a Researcher III were pretextual. *See* [Doc. 30 at 9]. Instead, the undisputed material facts show that Mr. Holden has been a PI on projects (for which the NREL had already secured funding) and has had publications every year from 2017 to 2020, *see* [Doc. 30 at ¶¶ 56, 59; Doc. 44 at ¶¶ 56, 59], whereas Dr. Wang was never a PI on a funded project, she had two publications in 2017, and none between 2018 and 2019, [Doc. 30 at ¶ 63; Doc. 44 at ¶ 63]. It is also undisputed that Alliance has a limited budget to cover overhead funding, and Dr. Wang charged more overhead than any other employee who reported to Mr. Gonder. *See* [Doc. 30 at ¶¶ 62, 64; Doc. 44 at ¶¶ 62, 64]. It is further undisputed that, at the time of her termination, Dr. Wang was the only employee under Mr. Gonder who had received a "Needs Improvement" rating or was placed on a PIP. *See* [Doc. 30 at ¶ 68; Doc. 44 at ¶ 68].

Nevertheless, Dr. Wang attempts to establish pretext by arguing that Alliance's actions were inconsistent with her job responsibilities and/or company standards. *See* [Doc. 44 at 24]. Specifically, she characterizes Alliance's position with respect to Mr. Holden to be that "Mr. Holden[] has been more successful due to the fact that he had successfully secured research funding from multiple sources and performed at a *higher level*." [*Id.* (emphasis added)]. Based on this characterization, Dr. Wang argues it is "not fair" to hold her to the same standards because "there is no requirement that she perform at that level" and "[n]owhere in her job description does it state that she must perform these duties." [*Id.*]. She also contends that Alliance did not have a "formal requirement for researchers to bring in a specific dollar amount of funding" and, therefore, "it is apparent that the Company was utilizing standards that were not in fact required when

determining how much to pay its employees." [*Id.*].  Respectfully, the Court is not persuaded for several reasons.

First, as Alliance points out, Dr. Wang's failure to bring in sufficient funding was not the sole basis for her poor performance ratings.  *See* [Doc. 45 at 9].  For instance, in Dr. Wang's PIP, which went into effect *before* Mr. Holden's promotion to Researcher III in 2019, *see* [Doc. 30-9 at 2], Mr. Gonder noted that Dr. Wang had "struggled to meet and maintain the job performance expectations of a Researcher III," highlighting the "major points" as follows:

- Communication improvements – difficulty with descriptive communication and clear language in writing and discussions leads to misinterpretations and impressions of 'talking past each other' with some regularity. Presentations typically lack a clear and compelling narrative of how current and proposed future detailed work support big picture sponsor priorities.
- Work impact improvements – getting to the point of impactful and clearly valuable work outputs often requires a large amount of hand holding; results are typically not as extensively developed or implemented as would be expected/hoped.
- Work quality/productivity improvements – room for improvement with sharpness of work (avoiding unit errors, properly labeling plot legends and axes, etc.); outputs often seem low relative to hours charged/time invested.

[*Id.* at 2–3].  In addition, Dr. Wang fails to cite any evidence to support her assertion that "there [was] no requirement that she perform" at a "higher level."  [Doc. 44 at 24].  And her contentions that "her job description does [not] state that she must perform [higher level] duties" or that Alliance did not have a "formal requirement for researchers to bring in a specific amount of funding" fare no better.  [*Id.*].  Indeed, in addition to emphasizing the subject-matter expertise required of a Researcher III, the job description for that position expressly disclaims that the statements therein "are intended to describe the general nature and level of work being performed by people assigned to this classification" and "are not intended to be construed as an exhaustive list of all responsibilities, duties, and skills required of personnel so classified."  [Doc. 30-2 at 3; Doc. 44-1 at 2–3].  Notably, in Dr. Wang's PIP, Mr. Gonder stressed that "NREL has high job

expectations for staff at the Researcher III level," [Doc. 30-9 at 2 (emphasis in original)], and then provided a non-exhaustive list of such expectations and detailed the improvements that Dr. Wang needed to make to avoid any further disciplinary action. [*Id.* at 2–5].

Moreover, Dr. Wang has put forth no evidence suggesting that Alliance did not believe the proffered reasons for Mr. Holden's higher salary. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (explaining that to support a finding of pretext "[the plaintiff] must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."). And Dr. Wang's assertion that it was "not fair" for Alliance hold her to the high standards expected of her Researcher III position are not enough to create a genuine issue of material fact as to pretext on this issue. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006) ("Even assuming [plaintiff] subjectively believed she did not have a poor attitude or that her knowledge and performance were up to par, it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of her own relative performance." (brackets and internal quotations omitted)).

Dr. Wang also argues that Alliance paid Mr. Holden a higher salary upon his promotion to Researcher III in 2019 ($97,382.53) than Dr. Wang's salary when she was initially hired as a Researcher III in 2011 ($80,017.60). [Doc. 44 at 23]; *see also* [Doc. 44-1 at 118]. She contends that Mr. Holden earned a higher salary despite "having only been a Researcher III for approximately one (1) year as opposed to [Dr. Wang's] approximately nine (9) years" as a Researcher III before her termination. [Doc. 44 at 23]. Relatedly, Dr. Wang insists that she never earned as much as Mr. Holden "despite receiving numerous positive reviews prior to 2017." [*Id.*].

However, Dr. Wang fails to explain how any of this information relates to her sex-based pay discrimination claims. She does not, for example, present any evidence regarding the salaries of male Researcher IIIs when she was initially hired in 2011; whether Alliance had a policy or practice of paying employees a higher salary solely based on their tenure in a particular position with the company irrespective of any performance issues; or whether her salary as a Researcher III *in 2019* (i.e., after Mr. Holden was promoted to Researcher III) should have been higher solely based on her "receiving numerous positive reviews *prior to 2017*." [*Id.* (emphasis added)]; *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (In determining whether an employee is similarly situated to the plaintiff, "[a] court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.").

In sum, Dr. Wang fails to adduce any evidence to support her sex-based pay discrimination claim under Count VI—specifically, any evidence showing (1) that Alliance applied (or should have applied) performance standards differently to Dr. Wang than Mr. Holden; and (2) even though it is undisputed that Mr. Holden was meeting those standards while Dr. Wang was not, that Alliance's decision to pay Mr. Holden a higher salary was based on discrimination because of Dr. Wang's sex.

### B. Title VII Sex Discrimination (Count IV)

Like her other discrimination claims, to state her sex discrimination claim, Dr. Wang must establish her prima facie case by showing, *inter alia*, that she suffered an adverse employment action that "took place under circumstances giving rise to an inference of discrimination." *See PVNF*, 487 F.3d at 800.

In her Response, Dr. Wang combines her discussion of her sex and sex-based pay discrimination claims.  *See* [Doc. 44 at 22 (arguing that she "suffered an adverse employment action when she was consistently paid less than her male counterparts, and when she was ultimately terminated")].  Nevertheless, she concludes her argument by asserting, "since it is apparent that the Company was utilizing standards that were not in fact required when determining how much to pay its employees, it is inferred that the Company was using these same standards that were not required, when it determined whether to terminate Dr. Wang."  [*Id.* at 23]; *see also* [*id.* at 21 (arguing that "[s]ince her performance issues were based on discriminatory reasoning and her manager, Mr. Gonder, was the individual who had discriminatory animus towards Dr. Wang, and was the individual in charge of evaluating her progress, the Company cannot show that the determination to terminate Dr. Wang is not free of discrimination")].

Dr. Wang's sex discrimination claim fails for the same reasons as her discrimination claims based on her race, ancestry, ethnicity, color, and national origin: she fails to adduce any evidence to support her assertions that her performance issues or termination were based on her sex or that Mr. Gonder had a discriminatory animus towards her.  She also fails to establish that she was paid differently on the basis of her sex, and likewise fails to show that the standards for the Researcher III job position "were not in fact required" by Alliance.  [*Id.* at 24].  Accordingly, Alliance is entitled to summary judgment on Dr. Wang's sex and sex-based pay discrimination claims under Counts IV and VI.

## IV.   Dr. Wang Cannot Establish Her Retaliation Claims Under Section 1981 and Title VII (Counts II and V, respectively).[22]

To prevail on a claim for retaliation under Section 1981 or Title VII, Dr. Wang must show (1) she engaged in protected opposition to discrimination; (2) she suffered what a reasonable employee would have found to be a materially adverse action by the employer; and (3) a causal connection existed between the protected opposition and the materially adverse action. *See Hansen*, 844 F.3d at 925; *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) ("[T]he principles set forth in Title VII retaliation cases apply with equal force in § 1981 retaliation cases."). If Dr. Wang can establish a prima facie case, the burden shifts to Alliance "to come forward with a legitimate, non-retaliatory rationale for the adverse employment action." *Hansen*, 844 F.3d at 925. If Alliance meets its burden, then Dr. Wang "must show that the [Alliance's] proffered rationale is pretextual." *Id.*

For the first element of her prima facie case, Dr. Wang asserts that she engaged in protected opposition to discrimination in two ways: (1) when she filed her First Charge with the EEOC on January 4, 2019; and (2) when she filed the Second Charge on April 28, 2020. [Doc. 44 at 25]. There is no dispute that filing a charge of discrimination with the EEOC constitutes protected activity. *See Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007). With respect to the second element of her prima facie case, Dr. Wang contends that Alliance took two adverse actions against her: first, by giving her a "Needs Improvement" rating on her FY2019 performance review; and second, by terminating her employment. [Doc. 44 at 25–26].

---

[22] Similar to a Title VII discrimination claim, a plaintiff must exhaust administrative remedies before asserting a Title VII retaliation claim. *See Potter*, 347 F.3d at 1211. Alliance fails, however, to address this exhaustion requirement as to Dr. Wang's Title VII retaliation claim under Count V.

Alliance argues, *inter alia*, that "*[e]ven if* Dr. Wang can meet the first two requirements" of her prima facie case, she cannot establish the third element—that is, a causal connection between any of her protected activities and her FY2019 "Needs Improvement" rating and termination. [Doc. 30 at 20]; *see also* [Doc. 45 at 10 (arguing that Plaintiff does not produce evidence that Mr. Gonder took notes regarding Plaintiff's performance "for any purpose other than to support her" and outline the expectations for her improvement)]. The Court respectfully agrees with Alliance.

**First Charge and "Needs Improvement" Rating on FY2019 Review.** Dr. Wang asserts that a causal connection exists between her filing of the First Charge in January 2019 and her "Needs Improvement" rating in her FY2019 Review. [Doc. 44 at 25]. Specifically, she contends that after she filed the First Charge, "Mr. Gonder began retaliating against Dr. Wang while monitoring and documenting her work performance in excruciating detail so that he could create evidence that would support his future retaliatory actions." [*Id.*]. Relatedly, Dr. Wang also acknowledges that she "was working on her PIP after she filed the initial Charge," including that "Mr. Gonder was meeting with [her] consistently during this period and keeping extensive notes about Dr. Wang's performance." [*Id.* at 26]; *see also* [Doc. 44-1 at 128–44]. Dr. Wang insists "[t]he detail of these notes . . . indicates that Mr. Gonder was strategically formulating evidence to support . . . his future retaliatory actions" against her. [Doc. 44 at 26].

Dr. Wang fails to cite any evidence to support her contention that Mr. Gonder gave her a "Needs Improvement" rating on her FY2019 Review because she filed the First Charge. In addition, as discussed above, there is no dispute that the "Needs Improvement" rating in Dr. Wang's FY2019 Review was her *third* consecutive time receiving such a rating. *See* [*id.* at ¶¶ 20, 25; Doc. 30-6; Doc. 30-7; Doc. 30-8; Doc. 30-12]. And she fails to adduce any evidence showing

that the "Needs Improvement" rating in her FY2019 Review was anything more than a repetition of Dr. Wang's previous ratings for the same performance issues that already existed, let alone based on retaliation for filing the First Charge. *See, e.g.*, [Doc. 30-12 at 4 (noting that "[a]fter receiving 'needs improvement' performance ratings in FY17 and FY18 Joann was placed on a Performance Improvement Plan (PIP) during FY 2019" and Dr. Wang was "unfortunately still not meeting those expectations")]. Moreover, it is undisputed that Dr. Wang's warnings about her declining performance predate the First Charge and, thereafter, her performance issues persisted. *See* [Doc. 30-9]. Dr. Wang also fails to come forward with any evidence to suggest that the assessments of her performance in the FY2019 Review are false.

Further, although Dr. Wang references her PIP and claims that Mr. Gonder took "extensive notes" regarding her performance "to support his future retaliatory actions," [Doc. 44 at 26], she fails to cite any evidence supporting this assertion. *See* [*id.*]. Notably, there is no dispute that the PIP went into effect on December 31, 2018—*before* Dr. Wang filed the First Charge on January 4, 2019, *see* [Doc. 30-9; Doc. 30-15]. Moreover, in the PIP, Mr. Gonder stated he would set up biweekly meetings with Dr. Wang to review her performance, [Doc. 30-9 at 5]; and the "extensive notes" Dr. Wang references in her Response contain Mr. Gonder's notes from each of those meetings. *See* [Doc. 44-1 at 130–44]; *see also* [*id.* at 129 (Mr. Gonder's email sending the PIP meeting notes to Dr. Wang)]. Indeed, Mr. Gonder confirmed this was the case at his deposition, and further testified that he "sent [the notes] out to Gyda [Torbet] and [Dr. Wang] on an ongoing basis so that they would have the opportunity to correct anything [he] got wrong or add anything if they had any additions." [Doc. 45-2 at 94:16–24]. And, as Alliance correctly points out, Dr. Wang fails to come forward with any evidence to suggest that Mr. Gonder's notes about the PIP meetings are false. *See* [Doc. 45 at 10]. In sum, Dr. Wang identifies no evidence on the record to

create a material factual dispute with respect to Mr. Gonder's basis for taking notes regarding her work performance.

Dr. Wang also claims that Mr. Gonder "excluded [her] from an important meeting on February 6, 2019." [Doc. 44 at 25]. Following that meeting, on February 10, 2019, HR informed Mr. Gonder via email that Dr. Wang was concerned her exclusion from the meeting was retaliatory. *See* [*id.* at 25–26; Doc. 44-1 at 127]. In her Response to the Motion, Dr. Wang contends that Mr. Gonder's response to HR's email contained a "level of detail [that] is indicative of Mr. Gonder attempting to rationalize and justify his retaliatory actions." [Doc. 44 at 26]. Dr. Wang also insists that Mr. Gonder's response on April 3, 2019—nearly two months after HR sent their email— "indicates that Mr. Gonder was strategically formulating evidence to support his retaliatory actions." [*Id.*].

The Court respectfully finds that these arguments are insufficient to conclude, from a factual basis, that Mr. Gonder excluded her from the meeting in retaliation for filing the First Charge. And, again, Dr. Wang fails to come forward with any evidence to suggest that Mr. Gonder's reasons for excluding her are false. *See* [Doc. 44-1 at 126–27]. Further, and more significantly, the deposition testimony that Dr. Wang relies upon does not support her contention that she was excluded from the meeting *in retaliation* for filing the First Charge. *See* [Doc. 44 at 25 (citing [Doc. 30-1 at 93:6–24])]. Rather, at her deposition, Dr. Wang testified she felt she was excluded from the meeting because of *discrimination* on the basis of her sex and national origin, not because she filed the First Charge:

A.  In February 2019 I was excluded by a meeting Mr. Gonder organized.

**Q.  Okay.  And you believe that shows you were discriminated against because of what protected class?**

A.  Because I'm a female, my origin.

**Q. Okay. So you feel that you were excluded because you're female and you're from China? Is that fair? I'm just asking you. I need you to tell me if it's not accurate.**

A. It's hard for me to say exactly what is the reason, but I was discriminated. . . . I don't know where – I don't know the reason, but I was exclude [sic] from that meeting.

**Q. So you don't know the reason, but you feel that being excluded from that meeting can support your claim that you were discriminated against; is that fair?**

A. Yes.

[Doc. 30-1 at 93:7–24]. Under these circumstances, the Court finds that Dr. Wang fails to adduce evidence to support her Section 1981 and Title VII retaliation claims based on her filing of the First Charge.

***Second Charge and Termination.*** Dr. Wang also insists a causal connection exists between the filing of the Second Charge in April 2020 and her termination in July 2020, based on (1) the temporal proximity between those events, and (2) the fact that Mr. Gonder "never stopped keeping extensive notes" on her performance. [Doc. 44 at 26–27]. Similar to her arguments with respect to the First Charge, Dr. Wang again claims that Mr. Gonder's notetaking "indicate[s] that Mr. Gonder was creating and crafting evidence to support Dr. Wang's termination." [*Id.* at 27].

The Tenth Circuit has explained that "[c]ausation can be shown by a 'very close temporal proximity' between a protected activity and an adverse employment action." *Dunn v. Shinseki*, 71 F. Supp. 3d 1188, 1192 (D. Colo. 2014) (quoting *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). If, however, the temporal proximity between the protected activity and the retaliatory conduct is not "very close," a plaintiff "must offer additional evidence to establish causation." *O'Neal*, 237 F.3d at 1253. Here, approximately two and a half months elapsed between Dr. Wang's filing of the Second Charge on April 28, 2020 and her termination on July 8, 2020.

However, even assuming that the temporal proximity of two and a half months is sufficient to establish a causal nexus for the purposes of a prima facie case, *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (explaining that a "one and one-half month period between protected activity and adverse action may, by itself, establish causation" but, "a three-month period, standing alone, is insufficient to establish causation"), as discussed herein, Alliance has come forward with evidence of a legitimate, nondiscriminatory reason for Dr. Wang's termination.

Thus, the relevant inquiry here turns to whether Dr. Wang has offered sufficient evidence to raise a genuine dispute of material fact regarding pretext. *See Hansen*, 844 F.3d at 925. The Court finds that she has not. Although Dr. Wang argues that "Mr. Gonder's extensive notes" support causation, she once again fails to come forward with any evidence to suggest that Mr. Gonder's notes about her performance were false or based on retaliation for filing the Second Charge. *See* [Doc. 44 at 26–27]. Dr. Wang likewise fails to present any evidence showing any inconsistencies between the performance issues that Mr. Gonder identified in his notes after she filed the Second Charge and those identified in the months and years beforehand. *Compare, e.g.*, [Doc. 44-1 at 147–51] *with* [*id.* at 151–54].[23]

In sum, Dr. Wang fails to adduce sufficient evidence to create a genuine dispute of material fact regarding Alliance's non-retaliatory reasons for her termination.[24] Accordingly, Alliance is

---

[23] One such meeting is dated April 28, 2020, which is the same day that Dr. Wang filed the Second Charge. *Compare* [Doc. 44-1 at 151] *with* [Doc. 30-24 at 2]. It is unclear whether Dr. Wang filed the Second Charge before or after her meeting with Mr. Gonder on April 28, 2020.

[24] Alliance also argues that Dr. Wang cannot proceed with her Section 1981 national origin discrimination claim because "[n]ational origin relates to birthplace only, and not an individual's race." [Doc. 30 at 13]. For support, Alliance cites *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). [*Id.*]. Although Dr. Wang fails to address this argument in her Response, *see* [Doc. 44], the Court respectfully disagrees with Alliance. Indeed, Defendant's reliance on *St.*

entitled to summary judgment on Dr. Wang's Section 1981 and Title VII retaliation claims under Counts II and V.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendant's Motion for Summary Judgment [Doc. 30] is **GRANTED**;

(2)    All remaining hearings and deadlines, including the February 13, 2023 Trial Preparation Conference and four-day Jury Trial beginning February 21, 2023, are **VACATED**;

(3)    The Clerk of the Court is **DIRECTED to ENTER** judgment in favor of Defendant Alliance for Sustainable Energy, LLC and against Plaintiff Lijuan Wang; and

(4)    Defendant is entitled to its costs pursuant to Federal Rule of Civil Procedure 54(d)(1).

DATED:  September 28, 2022                                    BY THE COURT:

_____

Nina Y. Wang
United States District Judge

---

*Francis College* is misplaced, as the Supreme Court in that case held that "[b]ased on the history of § 1981, . . . Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis College*, 481 U.S. at 613.  Notably, the Court further concluded that if the respondent on remand could "prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, *rather than solely on the place or nation of his origin* or his religion, he will have made out a § 1981 case." *Id.* (emphasis added); *see also id.* at 614 (Brennan, J., concurring) (noting that ancestry and national original "are identical as a factual matter" and "national origin claims have been treated as ancestry or ethnicity claims in some circumstances," including, "[f]or example, in the Title VII context, [where] the terms overlap as a legal matter").